**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

**BAER, C.J., SAYLOR, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 6 EAP 2021 |
| | : | |
| Appellee | : | Appeal from the Order of Superior Court |
| | : | entered on July 29, 2020 at No. 3429 EDA |
| | : | 2018, affirming the Order entered on |
| v. | : | September 11, 2018 in the Court of |
| | : | Common Pleas, Philadelphia County, |
| | : | Criminal Division at Nos. CP-51-CR- |
| DERRICK EDWARDS, | : | 0002611-2013, CP-51-CR-0002614-2013, |
| | : | CP-51-CR-0002617-2013, CP-51-CR- |
| Appellant | : | 0002815-2013, CP-51-CR-0002820-2013, |
| | : | CP-51-CR-0002853-2013, CP-51-CR- |
| | : | 0002862-2013 and CP-51-CR-0002864- |
| | : | 2013. |
| | : | |
| | : | ARGUED: December 7, 2021 |
| | : | |

## OPINION ANNOUNCING THE JUDGMENT OF THE COURT

**CHIEF JUSTICE BAER**                                         **DECIDED: April 12, 2022**

In *Commonwealth v. Johnson*, 231 A.3d 807 (Pa. 2020), this Court held that prosecutorial overreaching sufficient to invoke double jeopardy protections under Article 1, Section 10 of the Pennsylvania Constitution includes not only intentional misconduct, but also reckless misconduct that deprived the defendant of a fair trial. We granted allowance of appeal in this matter to determine whether our reasoning in *Johnson* applies to preclude the retrial of Appellant Derrick Edwards on double jeopardy principles where the prosecutor acted with discriminatory intent when exercising a peremptory strike of an African American juror in

violation of *Batson v. Kentucky*, 476 U.S. 79 (1986).[1]  For the reasons that follow, we hold that the prosecutor's violation of *Batson* under the circumstances presented does not preclude the retrial of Appellant.  Accordingly, we affirm the judgment of the Superior Court, which affirmed the trial court's order denying Appellant's motion to dismiss the charges against him on double jeopardy grounds.

## I.  Background

The record establishes that in the early morning hours of September 18, 2012, Appellant, who is African American, and Rasheed Thomas robbed Keith Crawford at gunpoint in Philadelphia.  Five minutes later, the two men approached Kevin Cunningham at a bus stop, pointed a firearm at his face, and stated, "You know what this is."  After pushing Cunningham to the ground and striking his head with the firearm, Appellant and Thomas stole his cash, barber clips, a Bible, an engagement ring, and a cell phone.

A few weeks later on October 1, 2012, two African American males approached Whitney Coates, pointed a firearm at her face, and stated, "You know what it is."  In response, Coates handed the perpetrators her cell phone.  That same day, approximately thirty minutes later, Appellant and Thomas attempted to rob Donald Coke.  When Coke resisted, Appellant shot him twice in the left arm, and then fled with Thomas in a vehicle driven by Henry Bayard.  Within about fifteen minutes, Appellant committed another armed robbery, this time with Bayard, stealing Duquan Crump's wallet and cell phone.  A short time later, Appellant and Thomas robbed Shanice Jones at gunpoint, stealing her wallet and cell phone.  Soon after, two African American males robbed Hecktor De Jesus at gunpoint, stealing cash, an iPod touch, a wallet, and a backpack containing clothing and a taser.

---

[1] The Supreme Court held in *Batson* that a prosecutor's challenge to potential jurors solely on the basis of race violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

Approximately 45 minutes later, two African American males pointed a firearm at Jonas Floyd and stole his tote bag, headphones, cell phone, wallet, keys, and cash. Police soon located Appellant, Thomas, and Bayard in the vehicle in which they were travelling and recovered the firearms used in the robberies, as well as a significant amount of the enumerated stolen goods. On March 6, 2013, the Commonwealth charged Appellant with various crimes relating to these armed robberies.

Jury selection began on October 28, 2014.[2] Prior to the actual selection process, the trial court explained its *voir dire* procedure, indicating that the court would ask the prospective jurors questions while all of them were present in the courtroom to determine whether they had any beliefs, attitudes, or experiences that might interfere with their ability to be a fair and impartial juror. N.T. (Voir Dire), 10/28/2014, at 5. Specifically, the court would ask some general disqualification questions to the group as a whole and then conduct further follow-up inquiries directed at individual prospective jurors based upon their responses to the initial questions. Counsel for the parties were not given an opportunity to question the jurors. Appellant did not object to this procedure.

Consistent with the trial court's practice, counsel for Appellant and the Commonwealth exercised their peremptory challenges using a "pass the pad" method, where the court clerk would pass to counsel for each party the juror strike sheet listing the names of each potential juror. N.T. 8/15/2018 (Evidentiary Hearing on Motion to Dismiss), at 7-8. Counsel made notations on the juror strike sheet indicating whether counsel accepted or struck each prospective juror. *Id.* Unbeknownst to the trial court or the parties, the court crier noted on the juror strike sheet the race and gender of each potential juror. Appellant objected to these notations on the juror strike sheet. *See id.* at 90 (defense counsel stating, "I do now object to

---

[2] Thirty potential jurors were considered by the parties; thirteen were African American, fourteen were Caucasian, and three were designated as "Other."

that practice based upon how it has been utilized"); *id.* at 90-91 (defense counsel indicating that the Commonwealth saw the notation of race or gender on the juror strike sheet and used that information in striking the jurors). The trial court overruled Appellant's objection, finding that the gender and race of the jurors listed on the strike sheet did not impact the attorneys' ability to evaluate the jurors, as the attorneys were present in the room and could observe the gender and race of the jurors in plain sight. *Id.* at 91.

After the trial court removed some venirepersons for cause, the parties exercised their peremptory strikes. There were two panels of jurors. Regarding the first panel of jurors chosen in the morning, the prosecutor accepted six of the first eight African Americans, accepted one juror whose race was indicated as "Other," and struck two African Americans. Jury Strike List, 10/28/14. Relating to the afternoon panel of jurors, the prosecutor struck five African Americans and one juror whose race was indicated as "Other." *Id.* Accordingly, the prosecutor utilized all eight peremptory challenges on individuals of a minority race, with seven of the eight strikes against African Americans.[3]

Significantly, on the basis of *Batson*, Appellant objected to only four of the Commonwealth's peremptory strikes of African Americans, challenging the striking of Jurors 56, 57, 61, and 67. N.T., 10/28/2014, at 92. The trial court accepted as race neutral the reasons the Commonwealth offered for striking Jurors 56, 57, and 61. *Id.* at 93-94. When the trial court asked the Commonwealth why it struck Juror 67, the prosecutor responded:

> Yes, and when she was being questioned by Your Honor, she was leaning back, seemed a little cavalier, had her arm resting on the back and while we were conducting *voir dire* in the back, she was sitting there with her arms crossed and her head kind of nodded, seemed guarded and again as if she didn't want to be here, so I didn't think she would be a fair and competent juror.

---

[3] Appellant exercised his eight peremptory strikes on one African American, six Caucasians, and one prospective juror whose race was listed as "Other."

*Id.* at 94. The trial court also found this explanation to be race neutral and denied Appellant's *Batson* challenge. *Id.* While the trial court did not examine on the record whether the Commonwealth's strikes were racially motivated notwithstanding the race-neutral reasons offered, it is implicit from the trial court's ruling that it found no discriminatory intent.

The original jury was composed of four African Americans, seven Caucasians, and one individual whose race was listed as "Other." Strike List 10/28/2014. The day after the jury was selected, both an African American juror and the juror identified as "Other" reported a hardship and were excused from the jury. *See* N.T., 10/29/2014, 4-7. They were replaced by two alternate jurors.

Appellant's trial commenced on October 29, 2014. At that time, Thomas, Appellant's cohort, had already pled guilty to multiple offenses relating to the robberies described *supra* and testified as a witness for the prosecution, but he refused to identify his conspirators. Over Appellant's objection, the Commonwealth read to the jury Thomas' confession. The Commonwealth further presented evidence establishing that some of the victims' property was recovered in the getaway car when Appellant and the other perpetrators were arrested.

On November 4, 2014, the jury convicted Appellant of eight counts each of robbery, conspiracy to commit robbery, carrying a firearm without a license, carrying firearms on the public streets of Philadelphia, possessing an instrument of crime, and one count each of attempted murder, aggravated assault, and conspiracy to commit aggravated assault. On January 9, 2015, the trial court sentenced Appellant to 22 to 44 years of incarceration.

On appeal to the Superior Court, Appellant contended *inter alia*, that: (1) the trial court violated *Batson* as a matter of law by listing the races and genders of potential jurors on the peremptory strike sheet; and (2) the Commonwealth violated *Batson* by striking four African American members of the venire with discriminatory intent. Regarding Appellant's first issue, the Superior Court held that although it did not countenance the practice of listing the gender

and race of the potential jurors on the juror strike sheet, that listing, in and of itself, did not violate *Batson* as a matter of law, as that decision disfavored the adoption of *per se* rules and, instead, encouraged consideration of all relevant factors when determining whether a prosecutor struck a potential juror based upon the juror's race. *Commonwealth v. Edwards*, 177 A.3d 963, 972 (Pa. Super. 2018) (citing *Batson*, 476 U.S. at 96).

In resolving Appellant's four *Batson* challenges to the Commonwealth's use of its peremptory strikes against Jurors 56, 57, 61 and 67, the intermediate court examined the following inquiries: (1) whether there was a *prima facie* showing that the circumstances gave rise to an inference that the prosecutor struck one or more potential jurors based on race; (2) whether the Commonwealth offered a race-neutral explanation for its exercise of peremptory strikes; and (3) whether Appellant carried his burden of proving purposeful discrimination. *Edwards*, 177 A.3d at 971-73 (citing *Commonwealth v. Watkins*, 108 A.3d 692, 708 (Pa. 2014)).

The Superior Court agreed with the trial court that Appellant established a *prima facie* case of purposeful discrimination by demonstrating that he is an African American and that the Commonwealth struck seven African American jurors. *Id.* at 972-73. The Superior Court also agreed with the trial court that all of the reasons offered by the Commonwealth for each of the four challenged strikes were facially race neutral. *Id.* at 973.

Contrary to the trial court's finding of no actual purposeful discrimination, however, the Superior Court held that Appellant did satisfy his burden of demonstrating purposeful discrimination, at least with regard to Juror 67. Acknowledging the deference owed to a trial court's finding in that regard, the intermediate court nevertheless concluded that such finding was clearly erroneous. *Id.* at 974. The Superior Court cited the fact that the prospective juror's race and gender were identified on the jury strike sheet.[4] *Id.* at 975. Additionally, the court

---

[4] Appellant did not contend that the Commonwealth asked the court crier to include the prospective jurors' race and gender on the juror strike street, and the prosecutor testified that she made no such request. N.T., 8/15/2018, at 9.

reasoned that the probability of the Commonwealth striking the high number of African Americans by chance was low and viewed the statistics of exercising all eight peremptory challenges on minorities as "startling." *Id.*

Finally, the Superior Court rejected the trial court's finding of no purposeful discrimination based on its conclusion that the Commonwealth's race-neutral explanation for striking Juror 67 was "wholly unpersuasive." *Id.* The intermediate court explained that the Commonwealth allegedly struck Juror 67 due to her inattentive posture which suggested that she would not discharge her duty as a juror in a fair and impartial manner, yet the trial court encouraged the prospective jurors to "sit back and relax." *Id.* at 976 (citing N.T., 10/28/2014, at 4). The court emphasized that the Commonwealth did not assert that Juror 67 was disruptive, ignored court instructions, or exhibited a disinclination to discharge her duties in an impartial manner. *Id.*

The Superior Court concluded that "[t]he persuasive value of the Commonwealth's explanation for striking Juror 67 is so low that, when combined with the other factors listed above, the totality of the circumstances indicates that the Commonwealth struck Juror 67 with discriminatory intent." *Id.* at 978. Accordingly, finding that a *Batson* violation took place, the Superior Court declined to address Appellant's remaining issues, vacated his judgment of sentence based entirely upon the discriminatory intent displayed by the Commonwealth in striking Juror 67, and remanded for a new trial.[5]

On July 18, 2018, Appellant filed a motion to dismiss his prosecution with prejudice, alleging that a retrial would violate the Double Jeopardy Clauses of both the United States and

---

[5] Judge Stabile dissented, positing that the majority failed to give sufficient deference to the trial court's finding of no purposeful discrimination and, instead, made the credibility determination itself. *Id.* at 986.

Pennsylvania Constitutions.[6] He relied upon *Commonwealth v. Smith*, 615 A.2d 321 (Pa. 1992), for the proposition that the conduct of a prosecutor intentionally undertaken to deny a defendant a fair trial bars retrial.[7] Appellant posited that the Superior Court in this case made specific findings regarding the intentionality of the prosecutor's misconduct, which served no purpose but to deprive him of a fair trial and subvert the truth-determining process; thus, his motion to dismiss should be granted.

The Commonwealth filed a brief in opposition to Appellant's motion to dismiss. Therein, it submitted that to demonstrate a double jeopardy violation under *Smith*, Appellant must establish "overwhelming and egregious" misconduct and "deliberate, bad faith" intent on the part of the prosecutor to deny a fair trial. Brief in Opposition to Motion to Dismiss, 7/23/2018, at 2 (citing *Commonwealth v. Burke*, 781 A.2d 1136, 1146 (Pa. 2001) (explaining that *Smith* requires "deliberate, bad faith overreaching by the prosecutor intended to provoke the defendant into seeking a mistrial or to deprive the defendant of a fair trial"); *Commonwealth v. Hockenbury*, 701 A.2d 1334, 1339 (Pa. 1997) (stating that "the engine that drove the *Smith* decision was the presence of overwhelming and egregious prosecutorial misconduct")). The Commonwealth contended that neither factor is present here, where the prosecutor allegedly exercised a single peremptory challenge with discriminatory intent. *Id.* at 3. It asserted that "[a]ny reversible error renders the trial unfair, or it would not be reversible; but not every reversible error implicates double jeopardy." *Id.* at 4.

---

[6] The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution provides that no person may be "twice put in jeopardy" "for the same offence." U.S. CONST. amend. V. The Double Jeopardy Clause of Article I, Section 10 of the Pennsylvania Constitution provides that "[n]o person shall, for the same offense, be twice put in jeopardy of life or limb[.]" PA. CONST. art. V, § 10.

[7] This Court's decision in *Johnson*, upon which Appellant relies herein, was not decided until nearly two years after Appellant filed his motion to dismiss.

The Commonwealth further argued that because Appellant's alleged double jeopardy claim is frivolous, it should be dismissed to prevent further delay of the trial proceedings. *Id.* at 7. It relied upon the Superior Court's decision in *Commonwealth v. Basemore*, 875 A.2d 350, 353 (Pa. Super. 2005) ("*Basemore II*"), which held that "[n]o state or federal court in any published or unpublished decision has ever held that a prosecutor's *Batson* violation, no matter the circumstances, constitutes prosecutorial misconduct of such a degree as to implicate double jeopardy principles." [8]

The trial court conducted an evidentiary hearing on Appellant's motion to dismiss on August 15, 2018, during which the Commonwealth introduced into evidence the notes of testimony of Appellant's *voir dire* proceeding. The Commonwealth further presented the testimony of the assistant district attorney who represented the Commonwealth during jury selection. The prosecutor outlined the aforementioned jury selection procedure, denied that she acted with discriminatory intent in exercising peremptory challenges, and reiterated her reasons for striking the prospective juror at issue.

On September 12, 2018, the trial court issued an order denying Appellant's motion to dismiss based on double jeopardy grounds. Appellant thereafter filed an interlocutory appeal in the Superior Court. In its subsequent Pa.R.A.P. 1925(a) opinion, the trial court held that Appellant was not entitled to relief as he had cited no case in which a *Batson* violation barred retrial on grounds of double jeopardy, and the court's research likewise revealed none. Trial Court Opinion, 2/1/2019, at 5. To the contrary, the court held, the Superior Court addressed the precise issue in *Basemore II*, *supra*, and held that a *Batson* violation, "without more," does

---

[8] As referenced herein, *Commonwealth v. Basemore,* 744 A.2d 717 (Pa. 2000) ("*Basemore I*"), involved the direct capital appeal of William Basemore, decided by this Court in 2000, relating to Basemore's 1995 PCRA petition, which alleged a *Batson* violation. Following retrial, Basemore was again convicted. "*Basemore II*" refers to the Superior Court's 2005 decision on appeal from Basemore's subsequent judgment of sentence, challenging the retrial on double jeopardy grounds.

not so "subvert the truth [-] seeking process as to implicate double jeopardy concerns." *Id.* at 7 (quoting *Basemore II*, 875 A.2d at 357.)

The trial court concluded that, consistent with *Basemore II*, the prosecutor's *Batson* violation should not preclude Appellant's retrial as the prosecutorial misconduct did not involve "concealing exculpatory evidence or completely disrupting the trial process," as occurred in the double jeopardy cases relied upon by Appellant. *Id.* at 9 (quoting *Basemore II*, 875 A.2d at 357). The trial court further concluded that the prosecutor's misconduct in striking at least one juror with discriminatory intent did not so "permeate [ ] the presentation of evidence that it was not possible for a reasonable jury to reach a fair verdict." *Id.* Finding that Appellant identified no reason why the court should depart from the Superior Court's holding in *Basemore II*, the court asserted that it properly denied his motion to dismiss.

The Superior Court affirmed in an unpublished memorandum. *Commonwealth v. Edwards*, 3429 EDA 2018, 2020 WL 4346744 (Pa. Super. July 29, 2020) (non-precedential decision).[9] The court explained that the Double Jeopardy Clauses of both the federal and state constitutions "prohibit retrial where prosecutorial misconduct during trial provokes a criminal defendant into moving for a mistrial." Superior Court Opinion, 7/29/2020, at 7 (citing *Oregon v. Kennedy*, 456 U.S. 667, 679 (1982); *Commonwealth v. Simmons*, 522 A.2d 537, 540 (Pa.

---

[9] Prior to resolving the merits of Appellant's claim, the Superior Court found that it had jurisdiction over the interlocutory appeal as it constituted a collateral order pursuant to Pa.R.A.P. 313(b). Superior Court Opinion, 7/29/2020, at 5 (citing *Commonwealth v. Orie*, 22 A.3d 1021, 1024 (Pa. 2011) (holding that orders denying a defendant's motion to dismiss on double jeopardy grounds are appealable as collateral orders, so long as the motion is not found to be frivolous)). The Court observed that Pa.R.Crim.P. 587 directs the trial court to make a specific finding as to frivolousness where it denies a motion to dismiss on double jeopardy grounds. Pa.R.Crim.P. 587(B)(4). The Rule further directs that if the trial court denies the motion to dismiss without finding it frivolous, it shall advise the defendant on the record that the denial is immediately appealable as a collateral order. Pa.R.Crim.P. 587(B)(6). The trial court did not make a finding as to whether Appellant's double jeopardy claim was frivolous. The Superior Court observed, however, that Appellant did not object to the trial court's failure to do so, and this omission did not affect the appellate court's jurisdiction over the appeal. Superior Court Opinion, 7/29/2020, at 6 n.1.

1987)). The court recognized, however, that Article 1, Section 10 of the Pennsylvania Constitution grants broader protection than its federal counterpart as it prohibits retrial "not only when prosecutorial misconduct is intended to provoke the defendant into moving for a mistrial, but also when the conduct of the prosecutor is intentionally undertaken to prejudice the defendant to the point of the denial of a fair trial." *Id.*, at 7 (quoting *Commonwealth v. Smith*, 615 A.2d 321, 325 (Pa. 1992)).

The Superior Court further acknowledged this Court's recent decision in *Commonwealth v. Johnson*, upon which Appellant relies herein. As noted, *Johnson* held that in addition to the misconduct described in *Smith*, prosecutorial overreaching sufficient to invoke double jeopardy protections under the Pennsylvania Constitution includes reckless misconduct that deprives the defendant of a fair trial. *Id.* at 8. The Superior Court found that, pursuant to *Johnson*, the type of prosecutorial misconduct that qualifies as overreaching under the state charter encompasses "governmental errors that occur absent a specific intent to deny a defendant his constitutional rights." *Id.*

Keeping in mind this jurisprudence, the Superior Court rejected Appellant's contention that the Commonwealth's *Batson* violation served no other purpose than to deprive him of a fair trial and subvert the truth-determining process, thereby prohibiting retrial on double jeopardy grounds. *Id.* at 8-9. The intermediate appellate court relied upon that court's prior decision in *Basemore II*, although it acknowledged that a portion of that decision was "no longer valid" in light of *Johnson. Id.* at 9 (citing *Basemore II*, 875 A.2d at 356 (finding no support in Pennsylvania double jeopardy jurisprudence for the notion that prosecutorial overreaching encompasses negligent or reckless conduct by a prosecutor)). The Superior Court concluded that *Johnson* did not address the overarching holding in *Basemore II* that "nowhere in the approximately twenty years of *Batson* jurisprudence has there been any suggestion that a *Batson* violation so subverts the truth-determining process as to implicate double jeopardy

concerns." *Id.* at 9 (quoting *Basemore II*, 875 A.2d at 357). Finding itself bound by *Basemore II* in this regard, the Superior Court determined that Appellant was not entitled to relief.[10]

This Court subsequently granted allowance of appeal to examine whether our reasoning in *Johnson* applies to preclude Appellant's retrial on double jeopardy principles where the prosecutor acted with discriminatory intent when exercising a peremptory strike of an African American juror in violation of *Batson*. An appeal grounded in double jeopardy raises a question of constitutional law over which our standard of review is *de novo*. *Commonwealth v. Jordan*, 256 A.3d 1094, 1104-05 (Pa. 2021). This Court's scope of review in rendering a determination on a question of law is plenary. *In re Domitrovich*, 257 A.3d 702, 711 (Pa. 2021).

## II. The Parties' Arguments

Appellant argues that the Double Jeopardy Clause set forth in Article I, Section 10 of the Pennsylvania Constitution precludes retrial where prosecutorial misconduct intentionally or recklessly deprives a defendant of a fair trial. This standard was satisfied here, he argues, because the prosecutor engaged in intentional misconduct by injecting racial discrimination into the jury selection process in violation of *Batson*. Brief for Appellant at 18 (citing *Batson* at 86) (holding that a prosecutor's intentional racial discrimination in jury selection "violates a defendant's right to equal protection because it denies him the protection that a trial by jury is intended to secure"). Appellant further asserts that intentional racial discrimination during jury selection has been held to impact the fundamental fairness of a trial. Brief for Appellant at 18-19 (citing *Basemore I*, 744 A.2d at 734 (holding that intentional discrimination on the basis of race in jury selection invokes the fundamental constitutional right to judgment by a jury of one's peers, is not subject to a harmless error or prejudice analysis, and instead constitutes structural error)).

---

[10] Judge Olson joined the memorandum authored by President Judge Panella, and Judge Nichols concurred in the result.

Appellant posits that while all *Batson* violations impact the fundamental fairness of a trial, the instant case is particularly egregious considering that the prosecutor exercised all eight peremptory strikes against minorities, with seven of the eight strikes against African Americans. He further asserts that the prosecutor attempted to conceal her purposeful discrimination by offering "brazenly pretextual" reasons for challenging Juror 67. Brief for Appellant at 22. He concludes that under these circumstances, it was impossible to receive a fair trial and any retrial is barred by the double jeopardy protections guaranteed by our state charter.[11]

Recognizing that the United States Constitution sets the constitutional floor for double jeopardy purposes, Appellant relies on three state cases to define Pennsylvania jurisprudence on the issue. First, he asserts that in *Commonwealth v. Smith*, *supra*, this Court afforded greater double jeopardy protection under the state charter. In addition to double jeopardy barring retrial where there was prosecutorial misconduct intended to goad the defendant into moving for a mistrial as held by the High Court in *Oregon v. Kentucky*, *supra*, Appellant emphasizes that *Smith* extended Pennsylvania double jeopardy protections to bar a mistrial where "the conduct of the prosecutor is intentionally undertaken to prejudice the defendant to the point of the denial of a fair trial." Brief for Appellant at 14 (citing *Smith*, 61 A.2d at 325).

Appellant observes that in *Smith*, the Commonwealth intentionally withheld exculpatory evidence and falsely denied an agreement with one of the main prosecution witnesses. He

---

[11] Appellant relies upon cases that did not involve *Batson* challenges but, rather, other prosecutorial misconduct that violated equal protection. Brief for Appellant at 20-21 (citing *United States v. Armstrong,* 517 U.S. 456, 463-64 (1996) (holding that the decision to prosecute criminal charges against a defendant under a particular law may not be based on an arbitrary classification such as race or religion); *Yick Wo v. Hopkins*, 118 U.S. 356, 373-74 (1886) (holding that where a criminal law is enforced by illegally discriminating against persons in similar circumstances in violation of equal protection, those incarcerated under such law shall be discharged); *State v. Rogan*, 984 P.2d 1231 (Haw. 1999) (precluding retrial under double jeopardy principles where the prosecutor in closing argument attempted to appeal to the racial prejudice of the jury).

argues, however, that the *Smith* holding is not limited to that type of prosecutorial misconduct, as this Court in *Commonwealth v. Martorano*, 741 A.2d 1221 (Pa. 1999), interpreted *Smith* "broadly" to encompass "all serious prosecutorial misconduct undertaken with the purpose of denying the defendant his constitutional right to a fair trial."[12] Brief for Appellant at 14 (citing *Martorano*, 741 A.2d at 1223). Appellant relies on *Martorano's* explanation that "the holding of *Smith* appears to be deliberately nonspecific, allowing for any number of scenarios in which prosecutorial overreaching is designed to harass the defendant through successive prosecutions or otherwise deprive him of his constitutional rights." Brief for Appellant at 15 (citing *Martorano*, at 1223).

Finally, Appellant relies on *Johnson*, where this Court held that Pennsylvania's double jeopardy protection prohibited retrial not only where the prosecutor engaged in intentional misconduct, but also where the prosecution engaged in misconduct undertaken recklessly with a conscious disregard for a substantial risk that the defendant will be deprived of a fair trial. Appellant's Brief at 15 (citing *Johnson*, 231 A.3d at 826). He acknowledges that *Johnson* recognized the countervailing need for effective law enforcement, noting that not all forms of prosecutorial misconduct would trigger double jeopardy protections. *Id.* at 15-16 Appellant further observes *Johnson's* sentiment that "retrial is only precluded where there is prosecutorial overreaching," as "overreaching signals that the judicial process has fundamentally broken down because it reflects that the prosecutor, as representative of an impartial sovereign is seeking conviction at the expense of justice." Brief for Appellant at 16 (citing *Johnson*, 231 A.3d at 824, 826).

Appellant contends that the *Batson* violation at issue constitutes the overreaching precluded by this Court in *Johnson*. He reiterates that the prosecution did not simply strike a

---

[12] The misconduct engaged in by the prosecutor in *Martorano* involved the repeated referencing of evidence that was either inadmissible or simply nonexistent.

few African Americans from jury selection, but exercised every peremptory challenge against racial minorities, a tactic that the Superior Court viewed as "startling." Brief for Appellant at 21-22 (citing *Edwards*, 177 A.3d at 975). Appellant concludes that even if this Court determines that the prosecutor did not strike Juror 67 with the intentional purpose of denying him a fair trial, the prosecutor's racial discrimination demonstrated at least a conscious disregard of the fundamental fairness of Appellant's trial so as to bar retrial under *Johnson*. Brief for Appellant at 23 (citing *Johnson*, 231 A.3d at 826 (providing that prosecutorial misconduct, "undertaken recklessly" with a conscious disregard that the defendant would be deprived of his right to a fair trial, precludes retrial under Pennsylvania's Due Process Clause)). In Appellant's view, the prosecutor, in contravention of the double jeopardy protections of the state charter and our jurisprudence interpreting the same, improperly sought his conviction at the expense of justice, which cannot be countenanced by this Court. Accordingly, Appellant requests that we reverse the Superior Court's decision, preclude his retrial, and dismiss the criminal charges filed against him with prejudice.[13]

In response, the Commonwealth contends that the lower courts properly held that the prosecutor's *Batson* violation in relation to Juror 67 does not preclude the retrial of Appellant on double jeopardy grounds. Initially, it acknowledges that *Batson* violations harm more than the individual defendant, affect the perception of fairness of the judicial system, and compel a strong remedy. The Commonwealth maintains, however, that Appellant has not cited a single

---

[13] An *amicus curiae* brief was filed in support of Appellant by the Atlantic Center for Capital Representation, advocating for a rule that precludes retrial under Pennsylvania's Double Jeopardy Clause in circumstances where there is an egregious *Batson* violation that is undertaken as part of a broader pattern of systematic discrimination. An *amicus curiae* brief was also filed in support of Appellant by the Pennsylvania Association of Criminal Defense and Defender Association of Philadelphia. These *amici* seek a bright-line rule, to be applied prospectively, barring retrial after a post-sentence finding of a *Batson* violation to serve as a strong deterrent to racial discrimination in jury selection and to increase trial courts' vigilance in seeking to prevent race-based peremptory challenges.

case, and its own research has revealed none, where a retrial of a criminal defendant was precluded on double jeopardy grounds based upon a *Batson* violation. The Commonwealth submits that the only relevant Pennsylvania decision on the issue is *Basemore II*, where the Superior Court declined to bar retrial on double jeopardy grounds where the prosecutor had struck nineteen African American venirepersons and created an instructional tape directing prosecutors to exercise peremptory challenges against African Americans as a trial tactic.[14]

The Commonwealth maintains that while *Batson* violations might compel discharge in the appropriate extreme case, the prosecutor's *Batson* violation regarding Juror 67 was remedied adequately by the grant of a new trial, and dismissal of the charges is not constitutionally required. *See* Brief for Appellee at 20 (opining that, in contrast to the single *Batson* violation here, the prosecution in *Flowers v. Mississippi*, 139 S.Ct. 2228 (2019), engaged in repeated *Batson* violations and other intentional prosecutorial misconduct in at least four of Flowers' six trials for the same murders, which misconduct may have merited discharge under double jeopardy principles if the double jeopardy issue had been presented to the Court).

According to the Commonwealth, the prosecutor's *Batson* violation serves as the beginning, not the end of the double jeopardy analysis. It interprets this Court's decision in *Johnson* as precluding retrial only "where a prosecutor commits egregious prosecutorial misconduct that constitutes overreaching so significant that it outweighs the strong societal interest in protecting the public from crime, and where a retrial enhances the possibility that an innocent person will be convicted." Brief for Appellee at 15-16. To determine this requisite egregiousness, it posits, the *Johnson* analysis entails a fact-specific inquiry into whether the

---

[14] The Commonwealth further asserts that five other states offer greater double jeopardy protection under their state charters than the federal counterpart, however, none of those states have declared that a *Batson* violation bars retrial on double jeopardy grounds. Brief for Appellee at 36 (collecting cases). It maintains that only Hawaii has addressed the precise claim and rejected it in *Commonwealth v. Daniels*, 122 P.3d 796, 802 (Haw. 2005).

prosecutor overreached at the expense of justice; society's strong interest in bringing the guilty to justice; and the economic and psychological effect of retrial on a citizen, as measured with the possibility that retrial may result in the conviction of an innocent person. The Commonwealth further contends that we must recognize, as *Johnson* directs, that jeopardy is not aimed primarily at penalizing the prosecutor's misconduct.

The Commonwealth submits that application of those factors to the prosecutor's misconduct in the instant case demonstrates that retrial is the appropriate remedy. Examining the specific circumstances surrounding the prosecutor's misconduct, it highlights that the trial court's *voir dire* process precluded counsel from questioning the prospective jurors, thereby constraining counsel's ability to assess the venirepersons' ability to serve on the jury. More significantly, the Commonwealth alleges, Appellant's focus upon the prosecutor's exercise of seven out of eight peremptory challenges on African Americans is misplaced, as Appellant challenged only four of the seven strikes of African Americans. As to three of those four challenges, the Commonwealth submits, the Superior Court agreed with the trial court's finding of race neutral reasons supporting each strike and did not hold that the prosecutor engaged in purposeful discrimination in connection with any potential juror other than Juror 67. Thus, it asserts, the record before this Court on appeal contains only a single *Batson* violation during a *voir dire* proceeding in which the prosecutor accepted the first six of eight African Americans as jurors. Further, the Commonwealth emphasizes that Appellant does not claim that there were racial issues in this case or that the prosecutor failed to strike white jurors who shared similar characteristics with those African American jurors who were alleged to have been struck with purposeful discrimination. Thus, it contends, the circumstances surrounding the prosecutor's misconduct weighs heavily in favor of retrial, as opposed to dismissal.[15]

---

[15] The Commonwealth discounts Appellant's contention that because the Superior Court deemed pretextual the prosecutor's reason for striking Juror 67, such pretext demonstrates the prosecutor's attempt to conceal her misconduct, which weighs in favor of dismissal of the

The Commonwealth further maintains that society's strong interest in bringing the guilty to justice weighs in favor of retrial, not discharge, considering that there was compelling evidence establishing Appellant's guilt relating to eight armed robberies and one shooting that occurred in connection with those offenses. It contends that shortly after the last robbery, police apprehended Appellant and his conspirators in the getaway car with the guns used in the robberies, along with some of the property that had been stolen from the victims. Further, the Commonwealth asserts that at Appellant's trial, the confession of Thomas was read to the jury, which implicated Appellant in the crimes. Thus, the Commonwealth avers that the financial and psychological costs to Appellant of a second trial weigh in favor of retrying him, as there is little likelihood that a second trial will result in the conviction of an innocent man. *See* Brief for Appellee at 33 (asserting that Appellant "is not an innocent citizen caught in the nightmare scenario of being repeatedly tried for crimes that he did not commit").

The Commonwealth also argues that the cases in which double jeopardy has precluded retrial are distinguishable, as they applied the sanction of dismissal only in the most blatant cases of egregious prosecutorial overreaching. It asserts that in *Smith*, the prosecutor failed to disclose that its primary witness testified in exchange for favorable treatment in his own criminal case, withheld exculpatory evidence, and thereafter accused the witness who revealed the withheld evidence of fabricating his testimony. Similarly, in *Johnson*, the Commonwealth asserts that the prosecutor failed to disclose DNA evidence that undermined the foundation of his case and falsely asserted that the DNA evidence presented proved the defendant's guilt when there was virtually no evidence of guilt.

---

charges, as opposed to retrial. The Commonwealth believes this contention is unpersuasive, as every *Batson* violation involves a finding that the prosecutor's proffered reason for striking a juror was pretextual; thus, dismissal would be required in every case where the prosecutorial misconduct involved a *Batson* violation.

The Commonwealth emphasizes *Johnson's* recognition that not all intentional prosecutorial misconduct precludes a retrial. Brief for Appellee at 30 (citing *Johnson*, 231 A.3d at 822 (holding that "the sanction of dismissal of criminal charges should be utilized in only the most blatant cases given the public policy goal of protecting the public from criminal conduct")). It posits that *Johnson* distinguished prosecutorial error warranting a new trial from prosecutorial overreaching, which "signals that the judicial process has fundamentally broken down because it reflects that the prosecutor, as representative of an impartial sovereign, is seeking conviction at the expense of justice." Brief for Appellee at 31 (quoting *Johnson*, 231 A.3d at 824). The Commonwealth concludes that for all the aforementioned reasons, the prosecutor's single *Batson* violation in this case does not warrant the ultimate remedy of discharge; rather, it is constitutionally remedied by the grant of a new trial.[16]

In his reply brief, Appellant discounts the Commonwealth's contention that the record establishes only a single *Batson* violation, arguing that while the prosecutor accepted six of the first eight African American prospective jurors on the morning of *voir dire*, the prosecutor struck every African American from the second panel of prospective jurors that afternoon. This demonstrates, he asserts, that the prosecutor was determined to prevent any more African Americans from being selected to serve as jurors. Appellant further attempts to relitigate the justifications for the striking of the other three African American prospective jurors challenged

---

[16] An *amicus curiae* brief has been filed in favor of the Commonwealth by the Office of the Attorney General ("OAG"), requesting this Court to hold that a *Batson* violation may never serve to preclude retrial on grounds of double jeopardy because the right involved in a *Batson* claim belongs to the juror, and a criminal defendant merely has third-party standing to remedy discrimination against jurors. The OAG posits that double jeopardy discharges resulting from *Batson* violations may deliver an unwarranted windfall to criminal defendants, regardless of whether the defendants suffered discrimination. The Pennsylvania District Attorneys Association also filed an *amicus curiae* brief in favor of the Commonwealth. It contends that the single *Batson* violation does not demonstrate that the prosecutor struck a juror recklessly and with a conscious disregard for Appellant's right to a fair trial, thereby barring retrial under this Court's decision in *Johnson*.

on direct appeal that were not addressed by the Superior Court and are not at issue in this appeal. Finally, he challenges any consideration of a defendant's guilt of the criminal offenses in the double jeopardy analysis, positing that there is no authority for the proposition that a defendant must demonstrate innocence to obtain double jeopardy protections under the state charter. Thus, he concludes, the strength of the Commonwealth's case is irrelevant to the double jeopardy determination.

*III. Constitutional Principles*

The issue presented in this appeal implicates the double jeopardy protection afforded by Article I, Section 10 of the Pennsylvania Constitution, as well as our distinct jurisprudence interpreting that provision. Because the underlying prosecutorial misconduct involves a violation of *Batson v. Kentucky,* we begin by examining the United States Supreme Court's seminal decision in that case.[17]

In *Batson*, the High Court began its discussion by recognizing the longstanding principle that "the State denies a black defendant equal protection of the laws when it puts him on trial before a jury from which members of his race have been purposefully excluded." *Batson*, 476 U.S. at 85 (citing *Strauder v. West Virginia*, 100 U.S. 303 (1880)). The Court explained that while a defendant possesses no right to a jury composed in whole or in part of persons of his own race, "the defendant does have the right to be tried by a jury whose members are selected pursuant to non-discriminatory criteria." *Id.* at 85-86. The purposeful discrimination in jury selection violates the defendant's individual right to equal protection because it "denies him the protection that a trial by jury is intended to secure." *Id.* at 86. The Court recognized that "[t]hose

---

[17] We clarify that our task is not to determine whether a *Batson* violation occurred, as the Superior Court on direct appeal answered that inquiry in the affirmative, which ruling constitutes the law of the case. This appeal involves only Appellant's subsequent motion to dismiss his prosecution on double jeopardy grounds based upon that *Batson* violation. The nature of the *Batson* violation is relevant to our double jeopardy analysis concerning whether such a violation may constitute prosecutorial overreaching so as to preclude retrial.

on the venire must be 'indifferently chosen' to secure the defendant's right under the Fourteenth Amendment to 'protection of life and liberty against race or color prejudice.'" *Id.* at 86-87 (quoting *Strauder*, 100 U.S. at 309 (footnote omitted)).

The High Court elucidated that racial discrimination in jury selection harms not only the criminal defendant, but also the excluded juror who was unconstitutionally discriminated against on account of the juror's race. *Id.* at 87. In fact, the Court reasoned, the harm from discriminatory jury selection practices is inflicted upon the entire community, as such practices "undermine public confidence in the fairness of our system of justice." *Id.* The Court opined that "[d]iscrimination within the judicial system is most pernicious because it is "a stimulant to that race prejudice which is an impediment to securing to [African American citizens] that equal justice which the law aims to secure to all others." *Id.* at 87-88 (quoting *Strauder*, 100 U.S. at 308).

At issue in *Batson* was the application of these principles to the State's exercise of its privilege to strike individual jurors through peremptory challenges. The Supreme Court explained that while a prosecutor may generally exercise peremptory challenges for any reason, the Equal Protection Clause of the Fourteenth Amendment precludes the prosecutor from challenging potential jurors exclusively on account of their race or based upon an assumption that African American jurors as a group would be unable to consider impartially the prosecution's case against an African American defendant. *Id.* at 89.

Rejecting the prior evidentiary burden of establishing a *prima facie* case of purposeful discrimination in jury selection set forth in *Swain v. Alabama*, 380 U.S. 202 (1965), the High Court explained that to establish a *Batson* violation, a criminal defendant must first demonstrate that he is a member of a cognizable racial group and that the prosecutor has exercised peremptory challenges to remove members of the defendant's race from the venire. *Batson*, 476 U.S. at 96. Once the defendant makes this *prima facie* showing, the burden shifts to the

State to provide a race neutral explanation to support its exercise of the challenged peremptory strike. *Id.* at 97. Third, the trial court then determines whether the defendant has established purposeful discrimination. *Id.* at 98. The Court concluded that "[i]n view of the heterogeneous population of our Nation, public respect for our criminal justice system and the rule of law will be strengthened if we ensure that no citizen is disqualified from jury selection because of his race." *Id.* at 99.

We turn now to our examination of double jeopardy principles. The federal Double Jeopardy Clause, which, as noted, provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb," U.S. CONST. amend. V, applies to the States pursuant to the Fourteenth Amendment. *See Benton v. Maryland*, 395 U.S. 784, 794 (1969). The federal Double Jeopardy Clause protects a criminal defendant from repeated prosecutions for the same offense. *Kennedy*, 456 U.S. at 671. The purposes of the federal Double Jeopardy Clause include the preservation of the finality and integrity of judgments and the denial to the prosecution of "another opportunity to supply evidence which it failed to muster in the first proceeding." *United States v. DiFrancesco*, 449 U.S. 117, 128 (1980) (internal quotation marks and citations omitted).

"[O]ne of the principal threads making up the protection embodied in the Double Jeopardy Clause is the right of the defendant to have his trial completed before the first jury empaneled to try him." *Kennedy*, 456 U.S. at 673. However, double jeopardy principles were not generally held to preclude the retrial of a defendant where the defendant terminated his own prosecution by requesting and obtaining a mistrial due to errors in the proceedings leading to conviction. *United States v. Tateo*, 377 U.S. 463, 465 (1964); *see id.* at 466 (providing that "[i]t would be a high price indeed for society to pay were every accused granted immunity from punishment because of any defect sufficient to constitute reversible error in the proceedings leading to conviction").

Developing federal jurisprudence recognized that even in circumstances where the defendant moves for a mistrial, double jeopardy principles may bar retrial, depending upon the circumstances under which the defendant's first trial was terminated. *Kennedy*, 456 U.S. at 673. The articulation of those precise circumstances proved difficult. The High Court first expressed the limiting principle in terms of prosecutorial overreaching, which it described as prosecutorial misconduct intended to provoke a defense motion for a mistrial or actions otherwise taken in bad faith to harass or unfairly prejudice the defendant. *Lee v. United States*, 432 U.S. 23, 34 (1977).

The High Court in *Kennedy* subsequently disapproved of the "overreaching" test, finding that it was unworkable due to the lack of adequate standards for application. *Kennedy*, 456 U.S. at 675. The *Kennedy* Court adopted a new standard, providing that the Fifth Amendment immunizes a defendant from retrial only where the government's actions were "intended to 'goad' the defendant into moving for a mistrial." *Id.* at 676.

Historically, the double jeopardy protections offered by Article I, Section 10 of the Pennsylvania Constitution were coextensive with those of its federal counterpart.[18] Recognizing a similarity of text and policy between the state and federal Due Process Clauses, this Court in *Commonwealth v. Simons*, 522 A.2d 537 (Pa. 1987), held that Pennsylvania's double jeopardy protections were coterminous with those afforded by the Fifth Amendment. In *Simons*, this Court adopted the *Kennedy* rule, declaring that "double jeopardy will attach only to those mistrials which have been intentionally caused by prosecutorial misconduct." *Id.* at 540.

In *Commonwealth v. Smith*, this Court, for the first time, interpreted Article I, Section 10 of the Pennsylvania Constitution as affording greater protection than the federal Double

---

[18] As noted, Article I, Section 10, provides that "[n]o person shall, for the same offense, be twice put in jeopardy of life or limb[.]" PA. CONST. art. I, § 10.

Jeopardy Clause. *Smith* involved a scenario where the prosecutor did not engage in outward misconduct that would goad the defendant into seeking a mistrial; thus, federal due process protections as set forth in *Kennedy* would not preclude retrial. Rather, the prosecutor in *Smith* concealed his efforts to subvert the truth-determining process by withholding exculpatory physical evidence during the defendant's first capital trial and knowingly denying the existence of an agreement with the Commonwealth's primary witness, which afforded the witness a lenient sentence in exchange for his testimony against the defendant.[19] *Smith*, 615 A.2d at 322. Further aggravating the matter, the prosecutor suggested that a police officer was fabricating testimony when he referenced on cross-examination the existence of the physical evidence concealed by the prosecutor. *Id.* at 323. The prosecutor went so far as to recommend to the deputy executive attorney general that the police officer be investigated for perjury. For two years while the defendant's case was on direct appeal, the Commonwealth continued to suppress the fact that it had the exculpatory evidence in its possession, while arguing to this Court in connection with the defendant's direct appeal that his death sentence should be affirmed. *Id.* at 323-24.

This Court viewed the prosecutor's behavior as constituting "prosecutorial misconduct such as violates all principles of justice and fairness embodied in the Pennsylvania Constitution's double jeopardy clause." *Id.* at 324. We declared that Article I, Section 10 of the Pennsylvania Constitution "prohibits retrial of a defendant not only when prosecutorial misconduct is intended to provoke the defendant into moving for a mistrial, but also when the conduct of the prosecutor is intentionally undertaken to prejudice the defendant to the point of the denial of a fair trial." *Id.* at 325.

---

[19] The physical evidence that was withheld in *Smith* was sand discovered in the murder victim's toes, which contradicted the Commonwealth's theory that the victim was murdered in Pennsylvania and supported the defense theory that the murder occurred in Cape May, New Jersey. *Id.* at 323.

This Court in *Commonwealth v. Martorano*, 741 A.2d 1221 (Pa. 1999), characterized our *Smith* holding broadly, opining that "there is no doubt that the Court intended the *Smith* rule to be one of general application." *Id.* at 1223. In *Martorano*, this Court precluded retrial on double jeopardy grounds where the prosecutor repeatedly referred to evidence that the trial court had ruled inadmissible, defied the trial court's rulings on objections, and insisted that there was fingerprint evidence linking the defendants to the crime when the prosecutor knew that no such evidence existed. *Id.*

In rejecting the Commonwealth's contention that the *Smith* holding should be limited to its facts, the *Martorano* Court opined that such holding "appears to be deliberately nonspecific, allowing for any number of scenarios in which prosecutorial overreaching is designed to harass the defendant through successive prosecutions or otherwise deprive him of his constitutional rights." *Id.* While not involving the concealment of evidence, we held that the prosecutor's misconduct in *Martorano* satisfied the *Smith* standard in that it "evinces the prosecutor's intent to deprive [the defendants] of a fair trial; to ignore the bounds of legitimate advocacy; in short, to win a conviction by any means necessary." *Id.*

This Court, however, acknowledged limits on the imposition of the ultimate remedy of dismissal of charges. In *Commonwealth v. Burke*, 781 A.2d 1136 (Pa. 2001), we explained that "[b]ecause of the compelling societal interest in prosecuting criminal defendants to conclusion, this Court has recognized that dismissal of charges is an extreme sanction that should be imposed sparingly and, relevant to the question here, only in cases of blatant prosecutorial misconduct." *Id.* at 1144. Unlike in *Smith*, the prosecutor in *Burke* had committed discovery violations that did not result from deliberate prosecutorial misconduct designed to coerce the defendant into moving for a mistrial or to deprive the defendant of a fair trial. *Id.* at 1146. Accordingly, the Court held that the proper remedy was the grant of a new trial, and not dismissal of the criminal charges. *Id.*

We considered the scope of protection offered by Pennsylvania's Double Jeopardy Clause most recently in *Commonwealth v. Johnson*, *supra,* which differed from the double jeopardy decisions preceding it, as the case did not involve intentional prosecutorial misconduct. Notwithstanding that the acts and omissions were not made intentionally or with a specific purpose to deprive the defendant of his rights, the record supported the trial court's conclusion that the prosecutorial mistakes were "unimaginable," suggesting a reckless disregard for the very real possibility of harm arising from the lack of thoroughness in preparing for the first-degree murder trial. *Id.* at 827.

The unimaginable prosecutorial errors involved the Commonwealth's mishandling of the most critical pieces of trial evidence, particularly two baseball caps, one red and the other black, each with a distinct property receipt number. Forensic analysis established that the victim's blood was found only on the black cap, which had a bullet hole in it, and that the red cap contained only the DNA of the defendant. At trial, the Commonwealth proceeded on the mistaken theory that there was only one baseball cap, the red one, which contained both the blood of the victim and the DNA of the defendant. The prosecutor repeatedly informed the jury that the defendant had shot the victim at close range, causing the victim's blood to appear on the defendant's cap, when no evidence supported such claim. Two Commonwealth witnesses reinforced this erroneous theory in their trial testimony.

The jury convicted the defendant of first degree murder. After the defendant brought the Commonwealth's mistaken theory to light on collateral review, the trial court vacated his conviction. The defendant subsequently filed a motion to bar retrial on double jeopardy principles, which the trial court denied on the basis that the prosecutor, while reckless, did not act intentionally to deny the defendant a fair trial. The Superior Court affirmed.

Relying on our previous decision in *Smith*, we recognized in *Johnson* the distinction between mere prosecutorial error and prosecutorial overreaching, as the former is an inevitable

component of the trial process, while the latter indicates that "the judicial process has fundamentally broken down because it reflects that the prosecutor, as representative of an impartial sovereign, is seeking conviction at the expense of justice." *Johnson*, 231 A.3d at 824 (internal citations omitted). We emphasized that this "overreaching" prerequisite remains firmly entrenched in Pennsylvania double jeopardy jurisprudence. *Id.*

The *Johnson* Court observed that the prohibition against double jeopardy is not intended primarily to penalize prosecutorial error, but to protect citizens against: (1) the embarrassment, expense, and ordeal of a second trial for the same offense; (2) the continued state of insecurity and anxiety arising from a second trial; and (3) the possibility of an innocent person being found guilty. *Id.* at 826 (citing *Commonwealth v. Ball*, 146 A.3d 755, 763 (Pa. 2016)). We reasoned that when the prosecution engages in improper conduct "sufficiently damaging to undercut the fairness of a trial, it matters little to the accused whether such course of conduct was undertaken with an express purpose to have that effect or with a less culpable mental state." *Id.* at 826. Either way, the Court concluded, the prosecutorial misconduct imposes upon the defendant the impermissible choice that double jeopardy principles seek to prevent, *i.e.*, the defendant choosing to give up his first jury or continue with that trial knowing that it is tainted by prejudicial prosecutorial error. *Id.*

Considering the egregious facts at issue, this Court declared that under "Article I, Section 10 of the Pennsylvania Constitution, prosecutorial overreaching sufficient to invoke double jeopardy protections includes misconduct which not only deprives the defendant of his right to a fair trial, but is undertaken recklessly, that is, with a conscious disregard for a substantial risk that such will be the result." *Id.* We clarified that double jeopardy is, of course, also violated under circumstances as occurred in *Smith*, involving prosecutorial tactics designed specifically to provoke a mistrial or deny the defendant his right to a fair trial. *Id.* Emphasizing that not all circumstances involving serious prosecutorial error implicate

Pennsylvania's Double Jeopardy Clause, we acknowledged the countervailing societal interests relating to the necessity for effective law enforcement. *See id.* (citing *State v. Michael J.*, 875 A.2d 510, 534 (Conn. 2005) (referring to the need for an "optimal balance between the defendant's double jeopardy rights and society's interest in enforcing its criminal laws")). Accordingly, we reversed the Superior Court's judgment affirming the denial of the defendant's motion to bar retrial and remanded for entry of an order granting such motion.[20]

*III. Analysis*

Keeping in mind these constitutional rulings, we initially decline to create a *per se* rule that all *Batson* violations constitute prosecutorial overreaching to bar retrial under the state charter as a matter law. As referenced at length *supra*, this Commonwealth's double jeopardy jurisprudence has not employed *per se* rules regarding categories of prosecutorial transgressions. Instead, we have examined prosecutorial misconduct in terms of the level of egregiousness established in the particular case on appeal. Strikingly absent from our decisions in *Smith, Martorano,* and *Johnson* were any findings that the general type of misconduct at issue (*i.e.*, the concealment of evidence, the reference to evidence that has either been ruled inadmissible or is non-existent, or the reckless mishandling of DNA evidence) categorically governed whether the misconduct constituted prosecutorial overreaching so as to preclude retrial under our state charter's double jeopardy provision. As with all forms of

---

[20] Justice Dougherty filed a concurring opinion, in which he opined that although we broadened the double jeopardy standard to include reckless prosecutorial disregard of a substantial risk of denial of a fair trial, "the standard continues to be a stringent one that will be satisfied only in egregious cases." *Johnson*, 231 A.3d at 828. Justice Mundy filed a dissenting opinion, which this author joined. The dissent viewed the majority's expansion of double jeopardy protections as unwarranted, finding that the previous standard protected both a defendant's constitutional rights and society's interest in holding offenders accountable *Id.* at 829. Viewing dismissal of charges as an extreme remedy reserved for the most blatant prosecutorial misconduct, the dissent opined that such category should require some finding of bad faith intentional misconduct. *Id.* Accordingly, the dissent concluded that the prosecutorial misconduct clearly warranted a new trial, but not the dismissal of charges.

prosecutorial misconduct, each factual predicate has its own unique circumstances and degrees of seriousness that should be examined on a case-by-case basis when conducting the double jeopardy analysis.

The same is true of a *Batson* violation, which, by definition, involves intentional prosecutorial misconduct that violates the defendant's individual right to equal protection because it denies the safeguards that a trial by jury is intended to secure. *Batson*, 476 U.S. at 86. Deliberate racial discrimination in any form, and most definitely in the jury selection process, is repugnant to the Equal Protection Clause of the Fourteenth Amendment and cannot be countenanced. *Id.* at 89.

It is well-settled, however, that not all serious prosecutorial error that warrants the grant of a new trial likewise merits double jeopardy protection so as to require the dismissal of criminal charges. *See Johnson*, 231 A.3d at 822 ("In spite of the broader protections reflected in *Smith* and *Martorano*, later case law clarified that not all intentional misconduct is sufficiently egregious to be classified as overreaching and, as such, to invoke the jeopardy bar."). This is true due to the countervailing societal interest in enforcing criminal laws by prosecuting criminal defendants to conclusion. *See id.* at 826. Thus, we reaffirm that the question for double jeopardy purposes continues to be one of egregiousness of the challenged prosecutorial misconduct, as opposed to a categorical finding that a general type of prosecutorial misconduct constitutes prosecutorial overreaching that precludes retrial as a matter of law.[21]

---

[21] In *Basemore II*, a decision that is not binding upon this Court, the Superior Court attempted categorically to distinguish *Batson* claims from other claims that interfere with the truth-determining process, implying that *Batson* claims may never establish prosecutorial overreaching and preclude retrial. *Basemore II*, 875 A.2d at 356. In denying double jeopardy relief in this case, the lower courts relied upon *Basemore II*'s proclamation that "nowhere in the approximately twenty years of *Batson* jurisprudence has there been any suggestion that a *Batson* violation so subverts the truth[-]seeking process as to implicate double jeopardy concerns." *Basemore II*, 875 A.2d at 357. While Appellants and *amici* have failed to discover any cases since *Basemore II* was decided where double jeopardy barred retrial as a result of a *Batson* violation, the Commonwealth candidly acknowledges the potentiality for such a claim

In her responsive opinion, Justice Donohue concludes that we are accepting racial discrimination in jury selection by refusing to declare that Pennsylvania's Double Jeopardy Clause requires dismissal of criminal charges in all cases involving a *Batson* violation. *See* Donohue, J., Concurring and Dissenting Opinion, at 9 (opining that any *Batson* violation qualifies as prosecutorial overreaching precluding retrial, "[t]he only way to say it does not is to decide that some unspecified level of racial discrimination is acceptable, when the only tolerable level is none at all"); *id.* at 12 (opining that "[w]e cannot make a judgment call that some racial discrimination is acceptable").

Respectfully, this unfair characterization is untenable, as it suggests that every state and federal decision granting a new trial as a remedy for a *Batson* violation (as opposed to precluding retrial) affirmatively accepts some unspecified level of racial discrimination in jury selection. This proposition flies in the face of thirty-six years of jurisprudence that grants a retrial to remedy the grave denial of equal protection that arises when the dictates of *Batson* are violated. Our decision herein makes clear that distinct standards govern *Batson* claims and claims alleging violations of double jeopardy under the Pennsylvania Constitution. There is simply no authority establishing that satisfaction of the former, as a matter of law, satisfies the latter.

In determining whether a *Batson* violation qualifies as prosecutorial overreaching, thereby requiring the dismissal of charges, we first examine the relevant facts and circumstances surrounding the prosecutor's misconduct. Here, as noted, the trial court conducted the *voir dire* questioning without counsel's participation and removed six jurors for

_____

in extreme circumstances, unlike the instant case. *See* Brief for Appellee at 20 (referencing the circumstances that arose in *Flowers v. Mississippi*, *supra*, where the prosecutor engaged in repeated *Batson* violations and other intentional prosecutorial misconduct in at least four of *Flowers'* six trials for the same murders, as an example of a *Batson* violation that could potentially preclude retrial on double jeopardy grounds). Today, we decide only the case before us and hold that the *Batson* violation at issue here did not constitute prosecutorial misconduct that intentionally or recklessly deprived Appellant of his right to a fair trial.

cause. Counsel thereafter selected jurors using a "pass the pad" method, pursuant to which each counsel would indicate on the jury strike list whether they accepted or struck each prospective juror. The jury strike list indicated each prospective jurors' race and gender.

Significantly, in connection with the morning panel of jurors, the prosecutor accepted six of the first eight African Americans on the panel, and exercised her peremptory challenges by striking two African Americans. Jury Strike List, 10/28/2014. Relating to the afternoon panel of jurors, the prosecutor struck five African Americans and one juror whose race was indicated as "Other." *Id.* Accordingly, the prosecutor utilized all eight peremptory challenges on individuals of a minority race, with seven of the eight strikes against African Americans.

Notably, Appellant did not challenge all seven peremptory strikes exercised by the Commonwealth against African Americans during *voir dire* and did not contend that the seven strikes were racially driven. Thus, we should not view all seven strikes as though they were exercised in a racially discriminatory manner. Rather, Appellant challenged only four of the prosecutor's peremptory strikes of African Americans, and the trial court, the tribunal that observed the jury selection process firsthand, accepted as race neutral all the reasons the prosecutor offered for striking these jurors, and denied the *Batson* challenge, finding no evidence of purposeful discrimination.

In reversing the trial court's ruling, the Superior Court concluded that the record did not support the trial court's finding of no purposeful discrimination in relation to Juror 67 because: (1) the jurors' race and gender were listed on the jury strike sheet;[22] (2) the probability of the

---

[22] While the Superior Court relied upon the designation of the potential juror's race and gender on the jury strike list to find purposeful discrimination, these designations do not render the prosecutor's misconduct more egregious for purposes of double jeopardy because the prosecutor played no role in crafting the jury strike sheet. *See* N.T., 8/15/2018, at 8-9 (responding "No, of course not," when the prosecutor was asked if she requested the court crier to keep track of the potential jurors' race and gender); N.T., 10/28/2014, at 89 (indicating that the race and gender designations on the jury strike sheet were made unbeknownst to the trial court).

Commonwealth striking such a disproportionate number of African Americans by chance was low; and, (3) the prosecutor's explanation for striking Juror 67 was "wholly unpersuasive," as the prosecutor indicated that she struck the juror due to her inattentiveness to the proceedings as demonstrated by her leaning back in a cavalier manner, after the trial court had instructed the venire to "sit back and relax." *Edwards*, 177 A.3d at 96 (citing N.T., 10/28/2014, at 4).

We conclude that the nature of the *Batson* violation that occurred here favors retrial, rather than dismissal of the charges, because Appellant has not demonstrated prosecutorial overreaching, which signals that the judicial process has fundamentally broken down. *Johnson*, 231 A.3d at 824 (distinguishing between mere prosecutorial error and prosecutorial overreaching, which indicates that the "the judicial process has fundamentally broken down because it reflects that the prosecutor, as representative of an impartial sovereign, is seeking conviction at the expense of justice").

The record before us demonstrates that the prosecutor exercised a single peremptory challenge with discriminatory intent after having accepted six of the first eight African Americans on the jury. This misconduct, undeniably warranting a new trial, does not demonstrate an intentional or reckless disregard of the fundamental fairness of Appellant's trial, as occurred in *Smith*, *Martorano*, and *Johnson,* so as to warrant dismissal of criminal charges. We reach this conclusion in recognition that the prohibition against double jeopardy is not intended primarily to penalize prosecutorial error. *Johnson*, 231 A.3d at 826.

*V. Conclusion*

While reprehensible and certainly worthy of the grant of a new trial, the prosecutorial misconduct that occurred herein in the form of a *Batson* violation does not constitute the most egregious prosecutorial misconduct warranting double jeopardy relief under Article I, Section 10 of the Pennsylvania Constitution. The prosecutor's *Batson* violation does not constitute a prosecutorial tactic designed specifically to provoke Appellant into seeking a mistrial. Further,

the prosecutor's *Batson* violation does not demonstrate that the prosecutor intentionally deprived Appellant of his right to a fair trial. Finally, the prosecutor's *Batson* violation was not undertaken recklessly with a conscious disregard for a substantial risk that Appellant would be denied a fair trial. Accordingly, we affirm the judgment of the Superior Court, which affirmed the trial court's order denying Appellant's motion to dismiss the criminal charges against him on double jeopardy grounds.

Justice Todd joins the Opinion Announcing Judgment of the Court.

Justice Mundy files a concurring opinion in which Justice Dougherty joins.

Justice Donohue files a concurring and dissenting opinion in which Justice Wecht joins.

Former Justice Saylor did not participate in the consideration or decision of this matter.